IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FARZAD SHARIF, | : | No. 1:13-cv-96 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| RODNEY A. MANNING, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM and ORDER

### July 11, 2013

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Pending before the Court are two motions: a motion to dismiss (Doc. 29)
filed by the Commonwealth of Pennsylvania, John W. Laufer III, Rodney A.
Manning, Christopher L. Paris, John R. Brown, and the Pennsylvania State Police
(collectively referred to hereafter as the "PSP Defendants"), and a motion to
dismiss (Doc. 31) filed by the Pennsylvania State Troopers Association ("PSTA").
For the reasons set forth below, Defendants' motions shall be granted in part and
denied in part.

## I.     PROCEDURAL HISTORY

Plaintiff Farzad Sharif ("Sharif") initiated this action with the filing of a
Complaint (Doc. 1) on January 14, 2013. On April 5, 2013, Sharif filed an

Amended Complaint (Doc. 28).  The PSP Defendants filed a Motion to Dismiss

Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(1&6) and Motion

to Strike Pursuant to Fed.R.Civ.P. 12(f) (Doc. 29) and brief in support thereof

(Doc. 30) on April 19, 2013.  The PSTA filed a Motion to Strike and Dismiss

Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6)

(Doc. 31) and brief in support thereof (Doc. 32) on April 25, 2013.  Plaintiff filed a

brief in opposition to the PSTA's motion (Doc. 35) on May 9, 2013, and a brief in

opposition to PSP Defendants' motion (Doc. 36) on May 10, 2013.  No reply briefs

were filed. Thus, the pending motions have been fully briefed and are ripe for

disposition.

## II.    STANDARD

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept

all factual allegations as true, construe the complaint in the light most favorable to

the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief."  *Phillips v. County of Allegheny*,

515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292

F.3d 361, 374 n.7 (3d Cir. 2002)).  In resolving a motion to dismiss pursuant to

Rule 12(b)(6), a court generally should consider only the allegations in the

complaint, as well as "documents that are attached to or submitted with the

complaint, . . . and any matters incorporated by reference or integral to the claim,

items subject to judicial notice, matters of public record, orders, [and] items

appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d

256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the

pleading requirements of Rule 8(a).  Rule 8(a)(2) requires that a complaint contain

a short and plain statement of the claim showing that the pleader is entitled to

relief, "in order to give the defendant fair notice of what the claim is and the

grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint

attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual

allegations, it must contain "sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).  To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise

a right to relief above the speculative level . . . ." *Victaulic Co. v. Tieman*, 499

F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  Accordingly, to

satisfy the plausibility standard, the complaint must indicate that defendant's

liability is more than "a sheer possibility."  *Iqbal*, 556 U.S. at 678.  "Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it

'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679. Next, the district court must identify "the 'nub' of the . . . complaint – the well-pleaded, nonconclusory factual allegation[s]." *Id.* Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief. *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 588 n.8). Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

Federal Rule of Civil Procedure 12(f) allows the Court to strike any "redundant, immaterial, impertinent, or scandalous matter." F.R.C.P. 12(f).

## III.    FACTUAL BACKGROUND[1]

Plaintiff Farzad Sharif was born in Iran to parents of Iranian ancestry and immigrated to the United States at the age of seventeen.  (Doc. 28 ¶ 18).  He was hired by the Pennsylvania State Police ("PSP") as a State Trooper on or about May 17, 1993, and was during all times relevant to this action employed by the PSP. (Doc. 28 ¶¶ 18, 27).  Plaintiff alleges that an "unprofessional and unlawful culture" of discrimination exists within the PSP which has caused him direct harm and is "condoned, rewarded, and protected" by the PSP.  (Doc. 28 ¶¶ 36, 40).

The first instance of alleged discrimination occurred in fall of 1993, when Plaintiff was a Cadet posing for a photograph in the lecture hall of PSP's Academy in Hershey, Pennsylvania, and an unknown person called out "[t]hat should look nice next to your green card."  (Doc. 28 ¶ 33).  Plaintiff interpreted this statement to be a discriminatory statement regarding his ancestry, race, and national origin. (Doc. 28 ¶ 34).  Despite being present, no PSP supervisor or policymaker reacted to the shouted comment or took corrective action.  (Doc. 28 ¶ 35).

In 1996, Plaintiff participated in a promotion exam for the rank of Corporal. (Doc. 28 ¶ 50).  The testing included an initial phase during which the examinee

---

[1]  In accordance with the applicable standard of review, the following facts are derived from the Amended Complaint (Doc. 28) and viewed in the light most favorable to the Plaintiff.

was given approximately thirty minutes to take notes from various PSP manuals for use during the second phase of the test which was conducted without manuals in another room. (Doc. 28 ¶¶ 52, 53). After Plaintiff completed the initial note-taking phase, the test proctor placed Plaintiff's notes in a manila envelope and allowed Plaintiff a five minute break to use the restroom. (Doc. 28 ¶¶ 54, 55). When Plaintiff returned from the restroom, the proctor handed him a manila folder which Plaintiff discovered was empty. (Doc. 28 ¶¶ 56, 57). The proctor would not tell Plaintiff where his notes had gone, and he was forced to continue without notes. (Doc. 28 ¶¶ 58-60). Plaintiff later confirmed through conversations with other examinees that their envelopes contained their notes. (Doc. 28 ¶¶ 61-64). Plaintiff alleges that this treatment was committed against him only; was intended to discriminate against him on the basis of his race, nationality, and ancestry, because he was the only examinee of Iranian ancestry; and was designed to prevent him from passing the exam. (Doc. 28 ¶ 74).

Plaintiff later spoke with his PSTA representative at the Lancaster Station, who told him that since he had elected to complete the exam, there was nothing the union could do for him. (Doc. 28 ¶¶ 65-68). Relying on that advice, Plaintiff did not file a grievance. (Doc. 28 ¶ 69). Plaintiff further notified his supervisor, Lt. Richard Zenk, and various other supervisors, including Captain William A.

Horgas, Major Charles Skurkis, and Defendant Brown, of what had occurred during the exam, but no adequate investigation occurred. (Doc. 28 ¶¶ 75, 76).

Plaintiff believes discovery will reveal that persons less qualified than Plaintiff, who are not of Iranian race, ancestry, or nationality, were promoted to the rank of Corporal while Plaintiff was not. (Doc. 28 ¶¶ 77-79). This is possible because the PSP's promotion process separates eligible persons into two bands: "Immediately Promotable" and "Promotable." (Doc. 28 ¶ 42). Generally, the minimum score to make it into the "Immediately Promotable" band is approximately 80%. (Doc. 28 ¶ 43). However, being classified as "Immediately Promotable" does not necessarily mean that a promotion will occur; applicants who attain that classification can be promoted in any order, or passed over for promotion, regardless of their exam score. (Doc. 28 ¶¶ 44, 45). Plaintiff alleges that this system allows the PSP to promote non-minority applicants with significantly lower test scores than minority applicants without violating any PSP regulations or policies. (Doc. 28 ¶ 47).

In 1999, Plaintiff joined the PSP's Bureau of Integrity and Professional Standards and in 2001 he joined the Internal Affairs Division ("IAD") as an Investigator. (Doc. 28 ¶¶ 80, 81). On September 19, 2004, Plaintiff was selected to participate in an FBI undercover school, which was attended by persons from

many different law enforcement agencies including the FBI and PSP. (Doc. 28 ¶¶ 82, 83). During training, a female special agent from the FBI reported to Plaintiff that she was being harassed by a PSP Trooper and Plaintiff reported the incident to a high level PSP supervisor. (Doc. 28 ¶¶ 84, 85). Later, the high level PSP supervisor told Plaintiff that he had embarrassed him in front of the FBI and that, regarding the sexual harassment, Plaintiff needed "to learn to look the other way." (Doc. 28 ¶ 88).

In 2005, Plaintiff was promoted to the rank of Corporal. (Doc. 28 ¶ 89). In 2006, Plaintiff took the promotion exam for the rank of Sergeant. (Doc. 28 ¶ 90). On of the assessors for the oral portion of the examination, Lt. D.M., came to get Plaintiff and, upon seeing him, stated "oh, it's you." (Doc. 28 ¶¶ 95, 96). Plaintiff had never met or worked with Lt. D.M. previously, leading Plaintiff to believe that, in light of Plaintiff's status as the only PSP employee of Iranian ancestry, Lt. D.M.'s statement was in reference to Plaintiff's Iranian nationality. (Doc. 28 ¶ 102). Although Plaintiff was disturbed by the remark, he continued with the exam. (Doc. 28 ¶ 97). Plaintiff was not promoted, despite his test results being nearly identical to those of Corporal Brinkley, who was promoted to Sergeant. (Doc. 28 ¶¶ 98-101).

Following the exam, Plaintiff advised Defendant Brown, a PSP supervisor,

of what had occurred during the exam and asked him to investigate why, despite performing very similarly on the exam, Brinkley was promoted while Plaintiff was not. (Doc. 28 ¶ 103). Defendant Brown never provided an explanation and Plaitiff believes no adequate investigation ever occurred. (Doc. 28 ¶¶ 104, 110). Plaintiff also advised the then-Director of Human Resources, Linda Bonney, of the exam situation, who in turn asked Ms. Deborah Facciolo to investigate. (Doc. 28 ¶¶ 105, 106). When Ms. Facciolo eventually met with Plaintiff, she would not disclose the conclusions she had reached, only telling him that "your case is a can of worms no one wants to open. Just forget about this, take the test next time, and I am sure you'll do fine." (Doc. 28 ¶¶ 107, 108). In 2008, Plaintiff participated in another promotion exam for Sergeant. (Doc. ¶ 113). Following this exam, Plaintiff was promoted and became the IAD intake Sergeant. (Doc. 28 ¶¶ 121, 122).

In March 2009, Plaintiff was assigned to the Bureau of Training and Education (the "Academy") and he reported to the Academy on April 6, 2009. (Doc. 28 ¶ 123). Within a few days, Captain Rodney A. Manning began to refer to Plaintiff as his "boy." (Doc. 28 ¶ 124). Despite the fact that Plaintiff was married, Manning also began to refer to Captain Lisa S. Christie, Director of the Administrative Division of the Academy, as Plaintiff's girlfriend. (Doc. 28 ¶ 125).

In September 2009, Plaintiff's mother and aunt were involved in a motor

vehicle collision approximately one mile from Plaintiff's home. (Doc. 28 ¶¶ 126, 128). The collision was investigated by Trooper Christopher J. Campbell of Harrisburg. (Doc. 28 ¶ 126). Plaintiff's mother called Plaintiff to advise him of the incident and, being so close to the scene, he drove there in plain clothes to check on the welfare of his mother and aunt. (Doc. 28 ¶¶ 127-129). He was the first person to arrive at the scene and instructed his mother not to identify him as a member of the PSP so as to avoid the impression that he was improperly interfering with the investigation. (Doc. 28 ¶¶ 128, 129). Plaintiff did not identify himself as a PSP employee to anyone on the scene. (Doc. 28 ¶ 130). Plaintiff acted as an interpreter when his aunt, who does not speak English, gave her statement to Trooper Campbell. (Doc. 28 ¶ 131).

On October 28, 2009, Plaintiff's mother received a copy of Trooper Campbell's accident report and discovered it contained numerous mistakes, including the positioning of the two vehicles in the diagram, the vehicle identifying information, and the failure to note that Plaintiff's aunt had been an injured passenger. (Doc. 28 ¶ 134). Plaintiff reviewed the report and discovered other mistakes, including the directional orientation of the map, the speed limit of the roadway, and the vehicle's make, model, registration, and VIN. (Doc. 28 ¶ 136).

Plaintiff and his mother concluded that the report would need to be corrected

to ensure proper processing of her insurance claim, so Plaintiff asked Captain Christie if it would be a violation of PSP rules and regulations if he spoke with Trooper Campbell about the report (Doc. 28 ¶¶ 138, 139). Captain Christie advised that it would not and that she believed Plaintiff was obligated to bring the errors to Trooper Campbell's attention. (Doc. 28 ¶ 140). Plaintiff also spoke with Major Charles J. Skurkis, Jr., who was at the time the Director of the Bureau of Integrity and Professional Standards as well as the head of the IAD and Systems and Process Review Division. (Doc. 28 ¶ 142). Major Skurkis advised Plaintiff that Trooper Campbell was a recent police academy graduate and that Plaintiff should set up an in-person meeting with Campbell to discuss the report. (Doc. 28 ¶ 143). While Plaintiff was on the telephone with Corporal Mowery scheduling a meeting with Trooper Campbell, Captains William Horgas and Michael Patrick walked into Plaintiff's office. (Doc. 28 ¶ 144-146). After Plaintiff explained the situation to them, Captain Horgas suggested that perhaps there should be an IAD investigation against Trooper Campbell, to which Plaintiff responded that he did not wish to get anyone in trouble, he just needed the report to be corrected. (Doc. 28 ¶ 147-149).

Prior to Plaintiff's meeting with Trooper Campbell, he asked Corporal Steven C. Ward, an accident reconstruction expert, to provide an opinion regarding

the cause of the collision and Corporal Ward agreed to do so.  (Doc. 28 ¶¶ 157, 158).  When the two drove to the scene of the collision during their lunch break on November 4, 2009, Corporal Ward opined that the accident could very well have happened the way Plaintiff's mother claimed, contrary to the other driver's claim and Trooper Campbell's report.  (Doc. 28 ¶¶ 159-161).

Later that day, Sergeant Simon Wellman, Corporal Mowery's supervisor, arrived at Plaintiff's office and asked why he wanted to meet with Trooper Campbell.  (Doc. 28 ¶ 162).  Sergeant Wellman became angry and said that Plaintiff had no right to reinvestigate the incident.  (Doc. 28 ¶ 165).  Plaintiff explained that if the report was not corrected, his mother and aunt may be accused of insurance fraud, since the report did not even identify his aunt as having been involved despite the fact that she was transported from the scene by ambulance.  (Doc. 28 ¶ 167).  Sergeant Wellman stated he would discuss the matter with Trooper Campbell and left.  (Doc. 28 ¶ 168).  The next day, Plaintiff sent Sergeant Wellman an email noting that the type of vehicle, VIN, and registration plate were incorrect on Trooper Campbell's report.  (Doc. 28 ¶ 170).  Sergeant Wellman read the email, but did not respond.  (Doc. 28 ¶ 171).

On November 12, 2009, Plaintiff's mother spoke with Trooper Campbell by phone and offered to drive to Harrisburg from her home in State College to meet

with him in person and discuss the errors in the report. (Doc. 28 ¶ 172). Trooper Campbell declined an in-person meeting and told her the only correction he would make would be to add Plaintiff's aunt as an injured passenger. (Doc. 28 ¶ 173). On November 16, 2009, Plaintiff's mother advised him that she wished to file a complaint against Trooper Campbell, Corporal Mowery, and Sergeant Wellman. (Doc. 28 ¶ 173).

That same day, Major Skurkis and Captain Willard Oliphant called Plaintiff to inform him that Sergeant Wellman had filed a Blue Team complaint against him, initiating IAD Investigation No. 2009-0875, alleging that Plaintiff had interfered with Trooper Campbell's investigation. (Doc. 28 ¶¶ 175, 176). Plaintiff advised Major Skurkis and Captain Oliphant of his mother's desire to file a complaint against Campbell, Mowery, and Wellman, but Plaintiff was told by Major Skurkis that he should advise his mother not to file a complaint; rather, it would be investigated as part of the investigation into Sergeant Wellman's complaint. (Doc. 28 ¶ 177, 178). Her complaint was never investigated. (Doc. 28 ¶ 180). Plaintiff alleges that Wellman's complaint was filed to cover up Campbell's incompetence as well as to harass and retaliate against Plaintiff for being a former IAD investigator[2]. (Doc. 28 ¶ 179).

_____

[2] Plaintiff points out that Wellman is an active PTSA union member and that the IAD and PSTA have traditionally had an adversarial relationship. (Doc. 28 ¶ 179, n. 2).

On December 18, 2009, Plaintiff emailed Sergeant Bruce Edwards, President of the PTSA, to inform him of IAD Investigation No. 2009-0875 and to request that a PSTA attorney be assigned to represent him. (Doc. 28 ¶ 181). Plaintiff avers that the PSTA has routinely provided legal representation to Troopers during IAD interviews and other proceedings. (Doc. 28 ¶ 183). However, Sergeant Edwards did not acknowledge or respond to Plaintiff's email. (Doc. 28 ¶ 182). On December 23, 2009, Plaintiff emailed another PSTA representative, Trooper Todd Rudy, to again request legal representation. (Doc. 28 ¶ 184). Approximately one week later, Trooper Rudy informed Plaintiff via voicemail that he had spoken with Sergeant Edwards and that the PSTA would not be providing a lawyer to represent Plaintiff during his IAD interview. (Doc. 28 ¶¶ 185, 186).

The IAD investigation into Plaintiff's conduct was conducted by Corporal Daniel R. Devilbiss and Lieutenant Kathy Jo Winterbottom. (Doc. 28 ¶ 187). Plaintiff's initial interview with Devilbiss and Winterbottom took place on January 6, 2010. (Doc. 28 ¶ 189). Prior to the interview, Plaintiff asked to read the IAD report up to the point of his interview, but was denied the right to do so despite Plaintiff's contention that the IAD permits Troopers under investigation to do so. (Doc. 28 ¶¶ 191-193). Plaintiff alleges that the IAD investigation was deficient for a variety of reason, including failure to examine and investigate relevant evidence

such as the footage taken by Trooper Campbell's in-car video camera. (Doc. 28 ¶ 194). Plaintiff also avers that the IAD Report and Supplemental Report that were ultimately issued were defective, misleading, and false. (Doc. 28 ¶ 195). Defendant Christopher L. Paris was responsible for ensuring that the investigation was conducted in accordance with PSP rules and that the IAD was factually complete, but allegedly failed to do so. (Doc. 28 ¶¶ 196-199).

On November 19, 2009, Plaintiff took a promotion exam for the rank of Lieutenant. (Doc. 28 ¶ 200). When he entered the room where the Career Experience Exercise portion of the exam would be conducted, he noticed that the room was so dark that he could not read the numbers on his stopwatch's LCD screen, as the windows were covered and the only lighting in the room eminated from two small lights on the wall and a dim lamp approximately five to six feet away from Plaintiff's seat. (Doc. 28 ¶¶ 201-204). The two assessors in the room asked Plaintiff if he had any questions prior to beginning the exam and Plaintiff asked if the lamp could be moved closer to the table so he could see his stopwatch. (Doc. 28 ¶¶ 205, 208). The first assessor replied "Sure" and stood up to move the lamp, but the second assessor stopped him and said "No, we're not going to rearrange the room for you." (Doc. 28 ¶¶ 206, 207). Plaintiff repeated his request and the second assessor again told him that no accommodations would be made

and so Plaintiff began the exam. (Doc. 28 ¶¶ 208-210). Plaintiff later spoke to

another examinee, Sergeant Jeffrey D. Zapaach, who told him that he made the

same request and the same assessors moved the lamp and asked if there was

anything else they could do for him. (Doc. 28 ¶¶ 211, 212). Plaintiff emailed

several PSP officials on November 24, 2009, but Plaintiff alleges that no adequate

investigation occurred and that the lack of an investigation confirms Defendants'

discriminatory intent. (Doc. 28 ¶¶ 213, 214). Despite his treatment, Plaintiff still

obtained the highest score in the Academy. (Doc. 28 ¶ 261).

Defendant Captain Rodney A. Manning was assigned to adjudicate the IAD

complaint against Plaintiff and on February 4, 2010, Plaintiff went to the PSTA

office to pick up cassette tapes of his IAD interview. (Doc. 28 ¶¶ 215, 216).

While at the PSTA office, a PSTA lawyer asked him what he was doing there and,

after Plaintiff explained the circumstances of his IAD investigation, gave Plaintiff

his cell phone number and told him not worry and to call as soon as he found out

when he would be meeting with Captain Manning. (Doc. 28 ¶¶ 217, 218). On

March 3, 2010, Captain Manning told Plaintiff that he intended to sustain the IAD

complaint regardless of what the evidence established, which Plaintiff interpreted

as an admission by Manning that he was not interested in the merits of the

complaint but rather intended to take advantage of the opportunity created by the

IAD complaint to further harass and discriminate against Plaintiff for his race, ancestry, and national origin. (Doc. 28 ¶¶ 219, 220). Subsequently, Plaintiff contacted the PSTA attorney, brought a copy of the IAD report to his office, and informed him of the date of his meeting with Captain Manning. (Doc 28 ¶¶ 221-223). On March 5, 2010, Plaintiff again called the PSTA attorney, who informed him that he would not be attending the meeting, wished him luck, and hung up. (Doc. 28 ¶¶ 224, 225). At the March 8, 2010 meeting, Captain Manning admitted that he had not viewed the in-car camera footage or listened to any of the recorded interviews, but that he was going to sustain the complaint and issue a Disciplinary Action Report against him. (Doc. 28 ¶¶ 226, 227).

On March 17, 2010, Lieutenant R.W., a PSTA representative, arrived unexpectedly at Plaintiff's office and asked him how the IAD investigation was going and Plaintiff responded that he believed it was being conducted unfairly and improperly. (Doc. 28 ¶¶ 229, 230). Lieutenant R.W. told Plaintiff that he intended to "change things" by taking down Defendant Brown and Captain Oliphant and that he and Sergeant Edwards would "shepherd" Plaintiff through the IAD investigation if Plaintiff gave them some "dirt" on Brown and Oliphant that Plaintiff may have learned about during his time in IAD. (Doc. 28 ¶¶ 231-233). Although Plaintiff never agreed to assist Lieutenant R.W. or Sergeant Edwards,

Lieutenant R.W. called Plaintiff on March 18, 2010 to say that he would be able to get Plaintiff "safe passage" through the IAD investigation and to give Plaintiff the PSTA main attorney's cell phone number to call if he needed assistance. (Doc. 28 ¶¶ 233-235).

Ultimately, Defendant Laufer upheld Defendant Manning's decision. (Doc. 28 ¶ 236). After Plaintiff received a copy of the IAD Report and submitted his rebuttal, he met with Major Skurkis, who advised him that if his claims regarding the IAD investigation were true, IAD investigators Devilbiss and Winterbottom would be held accountable. (Doc. 28 ¶¶ 237, 238). In July of 2010[3], Major Skurkis told Plaintiff that he wanted to review the IAD investigation, but that Defendant Brown, the Deputy Commissioner of Administration and Professional Responsibility, directed him not to look into the matter. (Doc. 28 ¶ 239). Plaintiff alleges that Brown was responsible for overseeing the IAD and had the authority to correct the wrongdoing being committed, but failed to do so. (Doc. 28 ¶ 242).

On September 3, 2010, the PSP, through Defendant Paris, issued a Notice of Disciplinary Penalty and Written Reprimand against Plaintiff regarding the IAD complaint and, in response, Plaintiff filed Grievance HQ-318 to appeal the

---

[3] The Amended Complaint alleges that this took place in July of 2012, but this appears to be a mistake. Based on the allegation's placement in an otherwise chronological list of allegations, and the fact that its occurrence in 2012 would be illogical based on the circumstances, we presume that this event actually took place in July of 2010.

decision.  (Doc. 28 ¶¶ 243, 244).  On March 25, 2011, without consulting Plaintiff, the PSTA entered into a settlement agreement with the Commonwealth resolving the grievance through a modification of the charge, which Plaintiff was only notified about after-the-fact.  (Doc. 28 ¶¶ 245, 246).

After sustaining the IAD complaint, Captain Manning allegedly continued to engage in discriminatory behavior.  He ordered Plaintiff to empty garbage cans, despite this being a task normally performed by custodial workers.  (Doc. 28 ¶ 248).  On March 10 2010, he told Plaintiff to take the day off on April 1, 2010, because his "girlfriend," referring to Captain Lisa Christie, would be off that day. (*Id.*).  He told Plaintiff on April 8, 2010, that instead of burning candles, he should roll out his prayer rug, face east, and start praying.  (*Id.*).  On October 14, 2010, he noted that Plaintiff's office was cold and that the Plaintiff was "born in the Middle East, not Alaska."  (*Id.*).  On the same date, after Plaintiff declined to discuss promotion information with him, he stated "Don't make me flog your camel in front of you."  (*Id.*).  On October 26, 2010, he stated to Plaintiff in front of others, "What's wrong with pork? You people don't eat pork."  (*Id.*).  On June 17, 2010, upon learning that Plaintiff was suffering from ulcers, he asked "So how did you get ulcers? Were you swapping spit with Karen Borza?," referring to a then-Corporal and subordinate to Plaintiff.  (*Id.*).  On November 15, 2010, he called

Plaintiff a "moron" in front of a class of new employees waiting to start The Honor of the Force training.  (*Id.*).

When this conduct continued despite Plaintiff's meeting with Manning and asking him to stop, Plaintiff filed an EEO complaint against Manning.  (Doc. 28 ¶¶ 249, 250).  The PSP conducted an internal investigation, sustained the complaint, and in February 2011 removed Captain Manning from his position at the Academy. (Doc. 28 ¶¶ 251, 252).  Shortly thereafter, Captain Manning was permitted to retire without being disciplined.  (Doc. 28 ¶ 253).

As a direct result of Plaintiff's efforts, the PSP was provided the opportunity to host the Northwestern School of Police Command.  (Doc. 28 ¶ 254).  Initially, the PSP was going to be permitted to have one member attend the program free of charge, but as a direct result of Plaintiff's efforts, fourteen members were permitted to attend with three of them attending free of charge.  (Doc. 28 ¶¶ 256, 257). However, Plaintiff was not permitted to attend.  (Doc. 28 ¶ 257).  Attendees did include Sergeant Wellman, who initiated the IAD investigation against Plaintiff, allegedly for improper purposes.  (Doc. 28 ¶ 258).  Attendees also included a Lieutenant who had previously been disciplined for using a racial slur repeatedly in email correspondence and a Sergeant who had previously been disciplined for having sexual relations with a subordinate employee at PSP headquarters while

both were on duty.  (Doc. 28 ¶¶ 259, 260).

Although Plaintiff had obtained the highest score in the Academy on his last exam for Lieutenant, the PSP promoted several other persons other than Plaintiff and the list of eligible persons for promotion expired on December 29, 2011 without Plaintiff being promoted.  (Doc. 28 ¶¶ 261-263).  Prior to the expiration of this period, on September 20, 2011, Plaintiff took the exam for a second time. (Doc. 28 ¶ 266).  The exam papers included two sheets of white lined paper and examinees were advised that a proctor would provide additional sheets as requested.  (Doc. 28 ¶¶ 268, 269).  Plaintiff asked for additional paper and was given two sheets of legal-sized lined yellow paper which he used to complete the exam.  (Doc. 28 ¶ 270).  However, when he turned in his exam, he was told by the same proctor that the two yellow sheets would not be included because he wrote on the wrong type of paper.  (Doc. 28 ¶ 271).  Plaintiff avers that this caused him to be positioned lower on the eligibility list for promotion.  (Doc. 28 ¶ 272).

On January 10, 2012, Plaintiff gave testimony in the U.S. District Court for the Eastern District of Pennsylvania regarding *Joseph Farthing v. Pennsylvania State Police, et al.*, 5:11-cv-1052, which was unfavorable to the PSP.  (Doc. 28 ¶ 273).  Specifically, he testified about an IAD investigation he participated in regarding whether several PSP Lieutenants had hired underage prostitutes during

trips to Thailand and Vietnam between 2002 and 2008. (Doc. 28 ¶ 274, 275). Two of the Lieutenants retired prior to being subject to an IAD interview, while the third admitted during an IAD interview that he had hired prostitutes but claimed they all looked old enough. (Doc. 28 ¶¶ 276, 277). None of the Lieutenants were criminally charged and all were permitted to retire from the PSP without being demoted. (Doc. 28 ¶ 278). On January 18, 2012, eight days after providing testimony in the *Farthing* case, the PSP, through Defendant Paris, issued Plaintiff a revised Notice of Disciplinary Penalty and Written Reprimand. (Doc. 28 ¶ 279). To Plaintiff it appeared to be a reissuance of the earlier September 3, 2010 Notice of Disciplinary Penalty and Written Reprimand, making it appear that he had been disciplined again. (Doc. 28 ¶¶ 280, 281). On January 23, 2012, Defendant Lauer confronted Plaintiff at work, demanded that he sign a copy of the newly issued Notice, and denied Plaintiff's request to allow his attorney to review the document prior to his signing it. (Doc. 28 ¶¶ 283-285). Plaintiff refused to sign. (Doc. 28 ¶ 286).

On February 1, 2012, Plaintiff filed Grievance HQ-350 to appeal the January 18, 2012 issuance of the Notice of Disciplinary Penalty and Written Reprimand. The PSTA acknowledged the receipt of Grievance HQ-350 by letter dated February 1, 2012 and advised Plaintiff on March 9, 2012 that the Grievance Board

had voted not to proceed with arbitration.  (Doc. 28 ¶¶ 288, 289).

On June 11, 2012 and July 21, 2012, the PSP promoted numerous persons, almost all non-hispanic white males, who were less qualified than Plaintiff and junior to him in both employment longevity and experience.  (Doc. 28 ¶¶ 290-292). One of the persons promoted was Sergeant Wellman.  (Doc 28 ¶ 293).  Another persons promoted was B.R., a married female PSP employee who had previously been disciplined for having an inappropriate physical relationship with a married man while on duty.  (Doc. 28 ¶ 294).  Plaintiff avers that persons less qualified than himself based on test scores, experience, education, training, IAD disciplinary history, and/or length of service who are not of Iranian race, ancestry, or nationality were promoted while he was not.  (Doc. 28 ¶¶ 295, 296).

In response to Plaintiff's filing of his Complaint in this action, the PSP initiated IAD 2013-0043 against him, alleging that by placing his Complaint in the public record he "failed to exercise prudent consideration prior to divulging the substance and contents" of restricted employee information and contents of internal investigations.  (Doc 28 ¶ 297).  IAD 2013-0043 remains an open and active investigation.  (Doc 28 ¶ 298).  No PSP Trooper may be promoted while an active IAD investigation is pending against them.  (Doc 28 ¶¶ 299, 300).

IV.    DISCUSSION

Plaintiff's Amended Complaint contains seven counts: (1) First Amendment - Retaliation pursuant to 42 U.S.C. § 1983, against all Defendants except PSTA; (2) Title VII Discrimination - Race and National Origin, against PSP and Commonwealth of Pennsylvania; (3) Title VII Retaliation, against PSP and Commonwealth of Pennsylvania; (4) Pennsylvania Human Relations Act, against all Defendants except PSTA, PSP, and the Commonwealth; (5) Pennsylvania Human Relations Act - Retaliation, against all Defendants except PSTA, PSP, and the Commonwealth; (6) Breach of the Duty of Fair Representation pursuant to the PLRA/Act 111, against PSTA; and (7) Civil Conspiracy against all Defendants. As noted above, the PSP Defendants and PSTA have each filed separate motions which we shall address in turn.

### A.    The PSP Defendants' Motion

The PSP Defendants present a number of arguments in favor of the dismissal of Plaintiff's Amended Complaint, including that some or all of Plaintiff's claims are either time-barred or should be dismissed for failure to state a claim, lack of jurisdiction, and/or failure to exhaust his administrative remedies.  PSP Defendants also contend that paragraphs 259 and 260 of Plaintiff's Amended Complaint allege irrelevant actions by non-party PSP members and thus should be stricken pursuant to F.R.C.P. 12(f).  We shall address Defendants' arguments in turn.

## 1.    First Amendment Claim

Count I of Plaintiff's Amended Complaint sets out a claim under 42 U.S.C. § 1983 for First Amendment retaliation.  Plaintiff contends that he exercised his First Amendment rights by filing Grievance HQ-18, filing an EEO complaint against Captain Manning, testifying in federal court in connection with the *Farthing* case, and finally by filing the Complaint in this action.  Plaintiff alleges that he has not been promoted because he engaged in these activities and that Defendants' failure to promote him constitutes unlawful retaliation.

To state a claim under Section 1983 generally, a plaintiff must show that a defendant, "under the color of state law, deprived them of a federal constitutional or statutory right."  *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000)).  To establish a First Amendment retaliation claim specifically, Plaintiff must prove "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."  *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).  In situations such as the one before us, where a government employee alleges retaliation by a government employer, the Supreme Court has elucidated a more specific three-part test.  First, the employee must speak as a citizen and his or her speech must address a matter

of public concern. *See Connick v. Myers*, 461 U.S. 138, 147 (1983). The second step is to apply a balancing test to determine whether the employee's interest in the speech outweighs the state's interest in avoiding workplace disruptions. *See Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). Third, a plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *See Mt. Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).

Defendants argue that Plaintiff's testimony in the *Farthing* case cannot be the basis for a First Amendment retaliation claim because Plaintiff testified pursuant to his official duties and thus his speech was not as a citizen addressing a matter of public concern. We disagree and find that Plaintiff has presented sufficient facts to proceed. The Third Circuit has held that "the act of offering truthful testimony is the responsibility of every citizen, and the First Amendment protection associated with fulfilling that duty of citizenship is not vitiated by one's status as a public employee. That an employee's official responsibilities provided the initial impetus to appear in court is immaterial to his/her independent obligation as a citizen to testify truthfully." *Reilly v. City of Atlantic City*, 532 F.3d 216, 231 (2008). It is therefore clear that Plaintiff's speech was made as a citizen. His speech was made regarding alleged criminal acts by Commonwealth law

enforcement personnel, clearly a matter of public concern. Plaintiff's interest in providing truthful testimony about these alleged crimes undoubtedly outweighs the PSP's interest in avoiding workplace disruptions. The final requirement, that Plaintiff must show that his testimony was a substantial or motivating factor for retaliatory action, has been alleged sufficiently to survive a motion to dismiss. Plaintiff has averred that he was issued a written reprimand, without notice or explanation, eight days after providing testimony in the *Farthing* case. The temporal proximity between these two events is certainly not determinative, but is sufficient to raise a reasonable expectation that discovery will reveal evidence of this necessary element of Plaintiff's claim. Thus, Plaintiff's First Amendment retaliation claim based on his court testimony shall not be dismissed.

With regard to Plaintiff's claims regarding his written grievances and petitions, Defendants argue that Plaintiff's speech is personal to him and therefore not a matter of public concern capable of supporting a First Amendment claim. We agree with Defendants that Plaintiff's internal petitions do not "seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2501 (2011). Plaintiff filed Grievance HQ-318 "to appeal the Disciplinary Penalty and Written Reprimand" he had received as a result of the IAD complaint against

him.  It is not a public document; it is an internal appeal pursuant the PSP's

Collective Bargaining Agreement with the PSTA.  (Doc. 28 ¶ 244).  Plaintiff's

EEO complaint against Captain Manning is similarly confidential and not an

attempt to communicate publicly.[4]  Plaintiff may utilize other avenues to seek relief

for any retaliation he allegedly suffered in response for filing these internal or

administrative grievances, but he has not alleged a First Amendment violation.

On the matter of Plaintiff's filing of the original Complaint in this action,

however, he may proceed with his First Amendment claim.  A court filing is a

public communication.  Plaintiff's lawsuit inevitably and necessarily focuses only

on harms which he alleges to have personally suffered, but the broader issue of

misconduct and discrimination within the PSP is a matter of public concern.  We

must make all reasonable inferences in favor of the Plaintiff at this time, and we

can reasonably infer that Plaintiff has some interest not only in winning his lawsuit

and gaining whatever rewards may follow, but also in placing the PSP's alleged

misconduct and internal policies in the public sphere for outside scrutiny.  That

---

[4] The U.S. Equal Employment Opportunity Commission's website assures potential EEO
complaint filers that their personal information will be used only for "record-keeping purposes"
and that "EEOC employees are subject to strict confidentiality requirements by law."  Some
basic information is disclosed to the filer's employer to allow them to rebut the complaint, but
"information about the charging party and the respondent [are] kept confidential by EEOC and
will not be disclosed to the public by EEOC."  *See* U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, "Confidentiality", http://www.eeoc.gov/employees/confidentiality.cfm (last visited
June 25, 2013).

view is strengthened by the appearance of a press release about the case, authored by Plaintiff's counsel, on the website of the Harrisburg CBS affiliate.[5]  Articles about the case are also easily discoverable on the websites of the Harrisburg FOX affiliate[6] and the Lebanon Daily News[7] and appear to be based on the press release and/or the original Complaint.  Plaintiff has presented a colorable claim that he filed the action *sub judice* as a citizen addressing a matter of public concern.  The IAD complaint initiated against Plaintiff, which Plaintiff avers prevents him from being promoted while it is pending, specifically cites his "fail[ure] to exercise prudent consideration prior to divulging" certain information to the public through the filing of the original Complaint, so there is clear causation between Plaintiff's speech and the alleged retaliation.  We will not determine conclusively at this time whether Plaintiff's interest in his speech outweighs the state's interest in avoiding workplace disruption, but he has alleged sufficient facts to survive Defendants' motion to dismiss.

---

[5] Devon M. Jacob, *Pennsylvania State Police Sergeant Files Federal Lawsuit Claiming Discrimination Based On His Iranian Ancestry,* WHP-TV CBS 21 (Jan. 14, 2013), http://www.whptv.com/media/lib/8/0/c/e/0ce55dc9-9823-483c-85b0-9ed224f678a4/Sharif_Relea se_1_14_13.pdf.

[6] Nic Moye, *PA State Police Trooper Claims Racial Discrimination*, FOX 43 (Jan 14, 2013), http://fox43.com/2013/01/14/pa-state-police-trooper-claims-racial-discrimination/.

[7] *Iran-Born Trooper's Lawsuit Accuses Agency of Bias*, LEBANON DAILY NEWS (Jan. 14, 2013), http://www.ldnews.com/state/ci_22371562.

### 2. Statute of Limitations

Defendants contend that Plaintiff's Section 1983 claims fall outside the applicable statute of limitations and thus his claims based on those events should be dismissed. Defendants do not discuss in any detail whether Plaintiff's other claims are time-barred, so we will focus only on his claims under Section 1983.[8] For the purposes of determining whether a Section 1983 action is time-barred, federal courts apply the statute of limitations that would otherwise apply to a personal injury case under state law. *See Kost v. Kozakiewicz*, 1 F.3d 176, 189-190 (3d Cir. 1993). Thus, Pennsylvania law dictates a two-year statute of limitations for Section 1983 claims. *See Id.* (citing 42 Pa. C.S. § 5524).

Here, the only count of Plaintiff's Amended Complaint that contains a Section 1983 claim is Count I for First Amendment retaliation. As we have noted above, Plaintiff's remaining bases for this claim are his testimony in the *Farthing* case and the filing of his original Complaint in this case. Both of these events occurred less than two years prior to Plaintiff's filing of this action and therefore

---

[8] Defendants' brief does mention some of Plaintiff's other claims, but erroneously argues that they must be dismissed because Plaintiff has not alleged that he previously pursued claims through the Pennsylvania Human Relations Committee or U.S. Equal Employment Opportunity Commission. (Doc. 30 at 18). To the contrary, Plaintiff has alleged that he did both. (Doc. 28 ¶¶ 7-17). We will assume that this misstatement is a mistake or oversight rather than a deliberate attempt to mislead the Court, but we admonish Defendants' counsel to ensure that there are no similar errors in any subsequent filings.

Plaintiff's Section 1983 claims are not time-barred.

### 3.    State Law Claims

PSP Defendants argue that Plaintiff's claims in Counts IV, V, and VII must be dismissed because the Commonwealth of Pennsylvania has not consented to suit in federal court for state law conspiracy claims or claims under the Pennsylvania Human Relations Act.  However, Counts IV and V are not asserted against either the Commonwealth of Pennsylvania or the PSP.  Although Count VII appears to be asserted against all Defendants, including the Commonwealth and PSP, Plaintiff has indicated that the caption was imprecisely phrased and that Count VII is not being brought against the Commonwealth or PSP.  Thus, PSP Defendants' motion has no relevance to Counts IV and V and shall only be granted to the extent it seeks to clarify that Count VII is not being brought against the Commonwealth or PSP.

### 4.    Failure to Exhaust Administrative Remedies

PSP Defendants argue that Plaintiff failed to exhaust his administrative remedies because he did not file a grievance as provided by the Collective Bargaining Agreement between the PSP and PSTA.  PSP Defendants contend that "Plaintiff has not plead that the union as bargaining agent breached its duty of fair representation in its handling of an employee grievance."  (Doc. 30 at 21).  This is

a strikingly inapt argument, considering that Count VI of Plaintiff's Amended Complaint is asserted against Defendant PSTA and is captioned "Breach of the Duty of Fair Representation."  (Doc. 28 at 66).

PSP Defendants also cite as their authorities on the matter two cases: one where the Pennsylvania Supreme Court found that "an employee has no right to sue his employer in equity and assumpsit for wrongful discharge where his union has refused to proceed to arbitration" but that the employee's claims "seeking relief under 42 U.S.C. 1983 and the Fourteenth Amendment ... require further consideration," *Ziccardi v. Commonwealth of Pennsylvania*, 456 A.2d 979, 981-982 (Pa. 1982), and another holding that "[a] state cannot be held to have violated due process when a Plaintiff has refused to utilize procedural protections that were available." *Garzella v. Dunmore*, 280 Fed.Appx. 169, 173 (3d Cir. 2008). Plaintiff does not present claims similar to those that were dismissed in the authorities cited, and we cannot locate a rationale embedded in them which would justify dismissing any of Plaintiffs' claims at this time.

### 5.	Paragraphs 259 and 260 of Plaintiff's Amended Complaint

PSP Defendants argue that these paragraphs should be stricken pursuant to F.R.C.P. 12(f) because they contain "improper identification of non-parties." (Doc. 30 at 21).  In these paragraphs, Plaintiff describes PSP Troopers who were

selected ahead of him to attend the Northwestern School of Police Command. By way of showing that individuals less qualified than himself were chosen, he provides two examples. The first, in paragraph 259, is a PSP Sergeant who had previously been disciplined for engaging in sexual relations with a subordinate employee while both were on duty at PSP headquarters. The second, in paragraph 260, is a PSP Lieutenant who had previously been disciplined for using a racial epithet repeatedly in email correspondence. These two persons were identified by name in the original Complaint, but are identified only by their initials in the Amended Complaint.

Although PSP Defendants contend that these paragraphs are irrelevant and should be stricken, we agree with Plaintiff that they are part of an effort to show that less-qualified individuals with a history of disciplinary problems were promoted while he was not, supporting the inference that Plaintiff was treated unfairly based on some other factor, namely his race and ancestry. Therefore, paragraphs 259 and 260 will not be stricken from the Amended Complaint. However, in the interest of protecting the reputations of the two individuals, who are not alleged to have in any way harmed Plaintiff directly, we will place Plaintiff's original Complaint (Doc. 1) under seal so as to remove their full names from the public docket.

### 6. Supervisory Liability Claims

PSP Defendant's brief, immediately following the section discussing paragraphs 259 and 260, contains a section which argues against municipal liability. As none of the Defendants in this case are municipalities, we need not discuss this issue.

### 7. Personal Involvement of Individual Defendants

To establish personal liability in a Section 1983 action, a defendant "must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In this case, there is only one Section 1983 claim: Plaintiff's First Amendment retaliation claim in Count I of the Amended Complaint.

PSP Defendants argue that Brown, Laufer, and Paris are included as Defendants here not because of any individual involvement, but rather merely by virtue of their positions within the PSP. We disagree. Plaintiff has alleged that each of these individual Defendants was either personally responsible for discipline against him or was aware of discriminatory behavior and failed to do anything to stop it. Discovery may ultimately rebut Plaintiff's allegations, but he has pleaded personal involvement by the individual Defendants sufficient to survive a motion to dismiss.

### 8.   Qualified Immunity

A government official or officer sued in his or her individual capacity for a constitutional violation is shielded by qualified immunity from liability for money damages, provided he or she presents such as an affirmative defense.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).  Qualified immunity applies unless the officer violated clearly established law that the reasonable person would have known.  *See Harlow,* 457 U.S. at 818; *see also Pearson v. Callahan*, 555 U.S. 223 (2009).  The rationale for qualified immunity is "to ensure that before [officers] are subjected to suit, [they] are on notice their conduct is unlawful."  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  There need not necessarily be previous cases "materially similar" to the specific facts of the instant situation.  *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  However, the unlawfulness of the action or actions must be apparent in light of pre-existing law.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  This "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).  If an officer merely "made a reasonable mistake about the legal constraints on his actions," he or she "should therefore be protected against suit."  *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007).

Although some Defendants may ultimately be eligible for qualified immunity, we will decline to make that determination at this stage of the proceedings. The Third Circuit has stated that an inquiry into officials' subjective beliefs and motivations in a First Amendment retaliation case "cannot properly be resolved on the face of the pleadings, but rather can be resolved only after the plaintiff has had an opportunity to adduce evidence in support of the allegations that the true motive for the conduct was retaliation rather than the legitimate reason proffered by the defendants." *Larsen v. Senate of Commonwealth of Pennsylvania*, 154 F.3d 82, 94 (3d Cir. 1998). In the interest of allowing discovery which will allow the Court to make a more informed ruling on the issue, we shall not find at this time that any of the Defendants are entitled to qualified immunity.


9. **Eleventh Amendment Immunity**

PSP Defendants acknowledge that Plaintiff has brought suit against the individual Defendants in their individual capacities only and that only Counts II and III, Plaintiff's claims of Title VII discrimination and Title VII retaliation, are asserted against the Commonwealth and PSP. However, PSP Defendants nevertheless argue that Eleventh Amendment immunity exists to any extent (1) Plaintiff seeks punitive damages against the Commonwealth or PSP, (2) Plaintiff

asserts a state law conspiracy claim against the Commonwealth or PSP, and (3) Plaintiff's supervisor liability claims are construed as official capacity claims against either.  Plaintiff's brief does not present any arguments to the contrary.

Plaintiff's Title VII claims, his only claims against the Commonwealth or PSP, are not barred by Eleventh Amendment sovereign immunity.  *See Fiztzpatrick v. Bitzer*, 427 U.S. 445, 447-457 (1976) (holding that Congress has validly abrogated the States' Eleventh Amendment immunity in Title VII actions). Plaintiff is not suing any individual Defendants in their official capacities. Plaintiff, as we established earlier, is not pursuing a state law conspiracy claim against the Commonwealth or PSP.  Because this section of PSP Defendants' brief argues against claims and facts which do not appear to exist, we will grant no corresponding relief.

### 10.    Conspiracy Claim

Count VII of Plaintiff's Amended Complaint alleges that the individual Defendants and the PSTA worked together with the common purpose of discriminating against Plaintiff by initiating investigations against him in which Plaintiff's grievances would not be processed or arbitrated by the PSTA and would be settled without consulting Plaintiff.  PSP Defendants contend that Plaintiff's allegations lack specificity and must be dismissed.  We disagree.  Plaintiff's

allegations are broad, but are not so broad as to require dismissal before the parties have had an opportunity to engage in discovery. Plaintiff has alleged who was involved in the conspiracy, the object of the conspiracy, and the actions taken by the parties in furtherance of that objective. Defendants have far greater access than Plaintiff to evidence that may confirm or deny the existence of a conspiracy, and Count VII shall not be dismissed until the parties have had an opportunity to discover that evidence.

**B.    PSTA's Motion**

The PSTA is named in two counts of Plaintiff's Amended Complaint. Count VI alleges that the PSTA breached its duty of fair representation in violation of the Pennsylvania Labor Relations Act ("PLRA"), 43 P.S. §§ 211.1-211.13, and the Policemen and Firemen Collective Bargaining Act (referred to in the Amended Complaint and hereinafter as "Act 111"), 43 P.S. §§ 217.1-217.10. Count VII alleges that the PSTA participated in a civil conspiracy against Plaintiff.

The PSTA argues that Plaintiff's claims should be dismissed or stricken for a number of reasons. First, the PSTA argues that we should decline to exercise jurisdiction over Plaintiff's claims against it because they are grounded solely in state law and do not share commonality with Plaintiff's federal claims. Second, the PSTA argues that Plaintiff has failed to state a claim in Count VI because the union

was not legally obligated to provide him with an attorney and, even if it was, his claims are time-barred. Third, the PSTA argues that Plaintiff has failed to plead a state law cause of action for civil conspiracy because Count VII is factually deficient and, regardless, such a claim is not cognizable if Plaintiff's claims in Count VI are dismissed. We will address these arguments in turn.

### 1. Jurisdiction

Federal courts have jurisdiction over not only federal claims, but also "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Federal courts may exercise pendant jurisdiction when state and federal claims "derive from a common nucleus to operative fact, such that the plaintiff would ordinarily be expected to try them all in one judicial proceedings, and when the federal claim has sufficient substance to confer subject matter jurisdiction on the court." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). However, federal courts have "broad discretionary powers to decline pendant jurisdiction" after considering factors such as judicial economy and fairness to the parties. *Id.* at 726.

The PSTA contends that any claims Plaintiff may have against the union should be dismissed for lack of jurisdiction and instead be filed in state court. It

argues that Plaintiff's claims against PSP Defendants are grounded in federal

employment discrimination and retaliation law, while his claims against the PSTA

are of an entirely different nature and kind.

Plaintiff argues in response that the sum of his claims against all Defendants

are "inexplicably intertwined" in a common scheme involving multiple actors. We

agree. The allegations in Count VI are rooted in investigations and disciplinary

proceedings against him by PSP Defendants or Plaintiff's related grievances,

which were then allegedly improperly handled by the PSTA. The allegations in

Count VII are even more clearly interwoven with those against the other

Defendants, as the individual PSP Defendants and PSTA are alleged to have

conspired with one another. These are the types of claims, along with Plaintiff's

other claims against PSP Defendants, which would ordinarily be tried as part of

one judicial proceeding because they are derived from the same set of underlying

facts. It would be an unnecessary duplication of effort for Plaintiff to bring his

claims against the PSTA in state court when those claims share a factual

underpinning with his claims against the PSP Defendants. In the interests of

fairness, judicial economy, and convenience, we will not decline jurisdiction of

Plaintiff's state law claims against the PSTA.

**2.    Breach of the Duty of Fair Representation**

Under Pennsylvania law, a union bears a duty of fair representation to the members of the bargaining unit that it is certified to serve. *See Falsetti v. Local Union No. 2026*, 161 A.2d 882, 895 (Pa. 1960). A union that fails to act in good faith, reasonably and without fraud, in processing an employee's grievance becomes liable for breach of that duty. *Id*. In addition, an employee is entitled to have a union representative present during an investigatory interview, defined as a meeting "calculated to form the basis for taking disciplinary or other job-affecting actions against [the employee] because of past misconduct." *Pennsylvania Emergency Management Agency v. Pennsylvania Labor Relations Board*, 768 A.2d 1201, 1205 (Pa.Cmwlth. 2001).

First, the PSTA argues that Plaintiffs claims that he was denied an attorney to represent him during his investigatory interviews are time-barred. Under Pennsylvania law, the statute of limitations on a claim for breach of duty of fair representation is two (2) years. *See Casner v. AFSCME*, 658 A.2d 865 (Pa. Cmwlth. 1995). Plaintiff did not file his Complaint until January 14, 2013. Thus, the PSTA contends that all Plaintiff's claims arising from events taking place more than two (2) years prior to that filing are time-barred and must be dismissed.

Plaintiff does not present any argument in his brief rebutting the application of the statute of limitations and we can see no reason not to grant the relief the

PSTA seeks.  Plaintiff either knew immediately or reasonably promptly became aware of all of the events and actions allegedly taken by the PSTA.  This is not a case where alleged harms were only discovered long after they actually occurred. Plaintiff's claims in Count VI arising from PSTA's actions prior to January 14, 2011 are time-barred and shall be dismissed.  Plaintiff may, however, proceed with his claims arising from PSTA's actions after that date, such as those involving the union's resolution of Grievance HQ-318 and refusal to proceed to arbitration in Grievance HQ-350.

The PSTA also argues that Plaintiff has failed to state a cause of action for breach of duty of fair representation with regard to the allegations that are not time-barred.  The PSTA contends that it did not act arbitrarily, with a discriminatory intent, or otherwise in bad faith, and that the union "cannot be held liable for mere negligence or ineptitude in processing a grievance."  *Martino v. Transport Workers' Union of Philadelphia, Local 234*, 480 A.2d 242, 250 n. 12 (Pa. 1984).

Although we agree with the PSTA that there is a high standard for proving that a union is liable for mishandling a grievance, here Plaintiff has alleged that the union's actions were taken in bad faith and with a discriminatory intent.  Although Plaintiff's factual averments in support of this conclusion are far from overwhelming, we will not dismiss his claims until and unless discovery reveals

them to be without any true support.

**3.    Civil Conspiracy**

Finally, for the same reasons discussed above regarding Plaintiff's civil conspiracy claim against the individual PSP Defendants, we shall not dismiss Plaintiff's conspiracy claim against the PSTA at this time.

**V.    CONCLUSION**

For the foregoing reasons, we shall grant in part and deny in part PSP Defendants' Motion to Dismiss and grant in part and deny in part PSTA's Motion to Dismiss.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    PSP Defendants' Motion to Dismiss (Doc. 29) is **GRANTED IN PART** and **DENIED IN PART** to the following extent:

   a.    The Motion is **GRANTED** to the extent it seeks dismissal of the portion of Plaintiff's First Amendment retaliation claims based on Grievance HQ-138 and his EEO complaint against Captain Manning;

   b.    The Motion is further **GRANTED** to the extent it seeks to clarify that Count VII of Plaintiff's Amended Complaint is not being brought against the Commonwealth of Pennsylvania or

Pennsylvania State Police;

    c.      The Motion is further **GRANTED** to the extent it seeks that Plaintiff's Complaint (Doc. 1) be placed under seal;

    d.      The Motion is **DENIED** in all other respects.

2.    The PSTA's Motion to Dismiss (Doc. 31) is **GRANTED IN PART** and **DENIED IN PART** to the following extent:

    a.      The Motion is **GRANTED** to the extent it seeks dismissal of the portion of Plaintiff's claims for Breach of Duty of Fair Representation that arise out of occurrences that predate the filing of Plaintiff's Complaint by more than two (2) years and are thus time-barred;

    b.      The Motion is **DENIED** in all other respects.

3.    The Clerk is directed to place Plaintiff's Complaint (Doc. 1) under seal.

 

s/ John E. Jones III
John E. Jones III
United States District Judge